IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**MARY PADILLA**,

       Plaintiff,

vs.                            No.    **CIV 03-1444 MCA/WDS**

**UNUM PROVIDENT**, a/k/a
**UNUM LIFE INSURANCE COMPANY
OF AMERICA**, **PRESBYTERIAN HEALTH
CARE SERVICES, JOHN & JANE DOES 1-3,**

       Defendants.

## MEMORANDUM OPINION AND ORDER

      **THIS MATTER** comes before the Court on the *Motion for Summary Judgment of Defendant Presbyterian Healthcare Services* [Doc. No. 63] filed on May 24, 2005, and Plaintiff *Padilla's Motion to Amend Initial Pretrial Report Entered on May 26, 2005 & Motion to Allow Plaintiff to Submit More than 25 Interrogatories to Defendants* [Doc. No. 68] filed on June 15, 2005.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants Defendant Presbyterian Healthcare Services' motion and denies Plaintiff's motion for the reasons set forth below. All claims against Defendant PHS will therefore be dismissed from this action, and by separate order the Court will set a briefing schedule on Plaintiff's remaining ERISA claims against Defendant UNUM.

I.   **BACKGROUND**

The history of this litigation is set forth in the *Memorandum Opinion and Order* [Doc. No. 62] filed on May 20, 2005, and the *Order* [Doc. No. 31] filed on November 17, 2004. Subsequent to those rulings, Defendant Presbyterian Healthcare Services (PHS) moved for summary judgment as to all of Plaintiff's claims.  In its motion, Defendant PHS asserts that the long-term disability benefit plan that is the subject of this lawsuit qualifies as an "employment welfare benefit plan" governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 to 1461, and that none of Plaintiff's claims regarding the denial of her long-term disability benefits under this plan are directed at Defendant PHS.

In response to Defendant PHS's motion, Plaintiff does not dispute that Defendant UNUM was responsible for the denial of her long-term disability benefits, and therefore her claim for these benefits is directed at Defendant UNUM, not Defendant PHS.  Nevertheless, Plaintiff claims that Defendant PHS is a proper party to this action insofar as the *First Amended Complaint* [Doc. No. 33] requests a declaratory judgment that the long-term disability plan at issue in this litigation is not subject to ERISA.

Plaintiff also has filed a motion to amend the *Second Initial Pretrial Report* [Doc. No. 66] to allow additional interrogatories, extend the deadline for filing discovery motions until sixty days from the Court's ruling, and extend the deadline for Plaintiff to file a motion for summary judgment until forty-five days after the new deadline for discovery motions.  Both Defendant UNUM and Defendant PHS oppose Plaintiff's motion.  They contend that Plaintiff's counsel already has been afforded a fair opportunity to conduct discovery and that

no further extension of pretrial deadlines is warranted.

## II.   ANALYSIS

### A.   Defendant PHS's Motion for Summary Judgment

The Tenth Circuit has held that "the determination of whether a policy is governed by ERISA is a mixed question of fact and law.  Because this mixed question essentially involves conclusions drawn from undisputed facts, it is primarily a legal question" amenable to disposition by means of a motion for summary judgment.  Peckham v. Gem State Mutual of Utah, 964 F.2d 1043, 1047 n.5 (10th Cir. 1992).

The Rules of Civil Procedure do not require the parties to wait until the filing of an *Initial Pretrial Report* or the close of discovery before they may file motions for summary judgment.  See Fed. R. Civ. P. 56(b); Alholm v. Am. Steamship Co., 144 F.3d 1172, 1177 (8th Cir. 1998).  Defendant PHS's motion is timely under these rules and does not depend on the outcome of Plaintiff's motion to expand discovery and extend pretrial deadlines, because the relief requested in Plaintiff's motion is unlikely to produce genuine issues of material fact.  See Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285, 1290 n.2 (11th Cir. 2001).

Summary judgment under Fed. R. Civ. P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "When a motion for summary judgment is made and supported as provided in this rule, an adverse

party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed. R. Civ. P. 56(e).  Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."  Id.  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

The local rules regarding summary judgment procedures further provide that:  "The memorandum in support of the motion must initially set out a concise statement of all of the material facts as to which movant contends no genuine issue exists."  D.N.M. LR-Civ. 56.1(b).  Similarly, the "memorandum in opposition to the motion must contain a concise statement of the material facts as to which the party contends a genuine issue does exist."

4

Id.  Both parties' statements of material facts "must be numbered" and "must refer with particularity to those portions of the record" upon which the party relies.  Id.  "All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted."  Id.

With its motion for summary judgment, Defendant PHS sets forth statements of fact pursuant to D.N.M. LR-Civ. 56.1 which support the conclusion that Plaintiff's claim for denial of long-term disability benefits is governed by ERISA and is properly directed at Defendant UNUM, not Defendant PHS.  According to these statements of fact, Defendant UNUM administers claims for benefits under the long-term disability policy and is the party responsible for receiving claims submitted under this policy, making decisions with respect to claims, and reviewing those decisions.  Defendant PHS further states that it has no right, authority, or responsibility to administer long-term disability claims made under the policy, to approve or deny claims, or to review the denial of claims made by the third-party claims administrator under the policy.  [Doc. No. 64, at 4-5.]

In response to Defendant PHS's statement of facts recited above, Plaintiff does not deny or dispute that she was fully aware that Defendant UNUM, and not Defendant PHS, was the party responsible for receiving, administering, and deciding claims and interpreting the policy.  Plaintiff does not refer with particularity to any portion of the record which shows that Defendant PHS bears any legal responsibility under ERISA for the denial of her claim for long-term disability benefits, the determination that she is liable for an overpayment of disability benefits previously paid to her, or the failure to provide any

5

information required under ERISA.  Rather, Plaintiff simply states that the facts regarding Defendant UNUM's responsibility for these decisions are not material to the issue of whether or to what extent her claims are governed by ERISA in the first place.  [Doc. No. 70, at 4-7.]

Accordingly, Plaintiff's response to Defendant PHS's motion for summary judgment is limited to her claim that Defendant PHS is a proper party under the Declaratory Judgment Act, 28 U.S.C. § 2201 to 2202, insofar as Plaintiff is seeking a declaratory judgment that the policy at issue in this case does not qualify as an "employment welfare benefit plan" governed by ERISA.  Plaintiff's response to Defendant PHS's motion provides no factual or legal grounds why Defendant PHS should remain as a party in this litigation in the event that she does not prevail on this claim for a declaratory judgment.  It follows that whether Defendant PHS is entitled to summary judgment in this case depends on whether or to what extent the company's long-term disability plan is governed by ERISA.

To support her contention that Defendant PHS is not entitled to summary judgment on this issue, Plaintiff's response brief includes a statement of additional facts directed at Defendant PHS's utilization of a "cafeteria plan" under Section 125 of the Internal Revenue Code, 26 U.S.C. § 125, as a funding mechanism for the company's disability plan.  Plaintiff further asserts that the existence of this "cafeteria plan" has some bearing on whether Defendant PHS's disability plan is governed by ERISA, and that Defendant PHS fails to address the relationship between these two plans in its motion.  [Doc. No. 70, at 3, 7-8.]

Defendant PHS has attached a supplementary affidavit to its reply brief containing additional information that is responsive to Plaintiff's novel argument regarding the

6

company's cafeteria plan.  The general rule is that when a movant submits additional evidence in support of summary judgment after the filing of the non-movant's response, district courts have the option of either disregarding that additional evidence or providing the non-movant with the opportunity to file a surreply.  See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163-65 (10th Cir. 1998).  In this case, I elect to disregard Defendant PHS's supplemental affidavit in lieu of affording Plaintiff an opportunity to file a surreply because the information contained therein is largely cumulative and therefore unnecessary to determining the legal effect, if any, of Defendant PHS's cafeteria plan.

The starting point for my analysis of whether Defendant PHS's disability plan is governed by ERISA is the statutory definition of an "employee welfare benefit plan." ERISA defines an "employee welfare benefit plan," in relevant part, as "any plan, fund, or program ... established or maintained by an employer ... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise ... benefits in the event of ... disability."  29 U.S.C. § 1002(1).

To determine whether a plan falls under this statutory definition, courts typically first look to the requirements of the "safe harbor" provision contained in implementing regulations issued by the Department of Labor.  See, e.g., Gaylor v. John Hancock Mut. Life Ins. Co., 112 F.3d 460, 463 (10th Cir. 1997).  Under this "safe harbor" provision, a "group or group-type insurance program" is not governed by ERISA if each of the following conditions are met:

> (1)  No  contributions  are  made  by  an employer or employee

7

organization;

      (2) Participation the program is completely voluntary for employees or members;

      (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

      (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j) (2005); see Gaylor, 112 F.3d at 463.

If any of the conditions stated in this Department of Labor rule are not satisfied, the Court must then conduct a further evaluation of whether the policy in question qualifies as an ERISA plan under the conventional elements of the statutory definition. See Gaylor, 112 F.3d at 463. ERISA's statutory definition of an employee welfare benefit plan "can be broken down into five elements: '(1) a "plan, fund, or program" (2) established or maintained (3) by an employer ... (4) for the purpose of providing ... [disability] ... benefits ... (5) to participants or their beneficiaries.'" Peckham, 964 F.2d at 1047 (quoting Donovan v. Dillingham, 688 F.2d 1367, 1371 (11th Cir. 1982) (en banc)); accord Gaylor, 112 F.3d at 464.

Plaintiff contends that the disability plan at issue in this case does not satisfy all of these elements because Defendant PHS neither provided a benefit nor purchased insurance for the plan's participants or beneficiaries. In particular, Plaintiff contends that there was

no provision of a benefit or purchase of insurance by her employer because Defendant PHS did not pay any portion of the premiums on the disability policy issued by Defendant UNUM.

Plaintiff's contentions are not supported by the evidence of record. According to this evidence, Defendant PHS is listed as the policyholder on the long-term disability policy issued by Defendant UNUM. [Ex. A to Doc. No. 65.] The benefits available to eligible employees under this policy form part of a larger package of benefits described in Defendant PHS's "Custom Benefits Plan." [Ex. 1 to Doc. No. 70.]

The benefits described in the "Custom Benefits Plan" are divided into the following categories: medical, dental, vision, basic life insurance, long-term disability, additional long-term disability, accidental death or dismemberment (AD&D), supplemental life insurance, spouse life insurance, dependent life insurance, healthcare spending account, and day-care spending account. [Ex. 1 to Doc. No. 70.] The plan includes criteria established by Defendant PHS for determining who is eligible to participate, which of the benefits described therein are mandatory, and which are optional. As a full-time employee of Defendant PHS, Plaintiff was eligible to participate in the "Custom Benefits Plan" and was required to have: (1) "Basic Life insurance equal to 1 x your annual pay," (2) "Long-term disability equal to 40% of your monthly pay," and (3) "Individual medical coverage (unless you show proof of other medical coverage)." [Ex. 3 to Doc. No. 70.] The other categories of benefits described in the program (*e.g.*, dental, vision, additional long-term disability) were optional. [Ex. C to Doc. No. 65.]

The funding for Defendant PHS's "Custom Benefits Plan" is structured as a "cafeteria plan" under Section 125 of the Internal Revenue Code.  26 U.S.C. § 125.  "The term 'cafeteria plan' means a written plan under which . . . all participants are employees, and ... the participants may choose among 2 or more benefits consisting of cash and qualified benefits."  Id. § 125(d)(1).

Under Defendant PHS's cafeteria plan, the company contributes to the cost of certain benefit plans by providing its employees with "Custom Dollars--dollars you may use to buy the benefits you want.  Your Custom Dollars are applied automatically to the cost of your medical coverage first.  Any remaining Custom Dollars are listed as income on your paycheck stub."  [Ex. 3 to Doc. No. 70.]  Premiums for each category of benefits are then deducted from the employee's pay.

These deductions are made on either a pre-tax basis or an after-tax basis, depending on the type of benefit the employee is purchasing.  In the case of long-term disability insurance, the deductions are made on an after-tax basis [Ex. 2 to Doc. No. 70], which means that the premium payments are paid from taxable income and any disability benefits received by a disabled employee are non-taxable.  See Benefits Provided Under Certain Employee Benefit Plans, 54 Fed. Reg. 9460, 9501 (proposed Mar. 7, 1989) (to be codified at 26 C.F.R. §§ 1.89(a)-1, 1.89(k)-1), 1.125-1, and 1.125-2) (hereinafter "Proposed Treasury Regulations").

Pursuant to Defendant PHS's "Custom Benefits Plan," Plaintiff received $81.50 in "Custom Dollars" on each of the first two pay periods of each month.  [Ex. D, E to Doc. No.

65.]  Her pay stubs reflect that, for each of these pay periods, $69.00 was spent on mandatory individual medical coverage; $1.75 was spent on mandatory basic life insurance coverage; and $3.50 was spent on mandatory 40% long-term disability coverage.  [Ex. 4 to Doc. No. 70; Ex. E to Doc. No. 65.]  Thus, the total cost of the premiums for the mandatory benefits required under the plan was $74.25 per pay period, which is $7.25 less than the total amount of $81.50 in "Custom Dollars" that Defendant PHS gave to Plaintiff to spend on her "Custom Benefits Plan."

Plaintiff points out that the total cost of the optional benefits that Plaintiff selected under the "Custom Benefits Plan" exceeds the $7.25 in "Custom Dollars" that Plaintiff had left to spend after the premiums for her mandatory benefits were paid.  In particular, Plaintiff's pay stubs reflect that she was charged $5.55 for additional long-term disability benefits, $0.92 for AD&D benefits, $10.50 for dental benefits, and $2.50 for vision benefits.[1] [Ex. 4 to Doc. No. 70.]  Plaintiff also has submitted documents from Defendant UNUM which suggest that, for payroll and tax purposes, Defendant UNUM treated the premiums for long-term disability coverage as 100% payable in after-tax dollars by the employee.  [Ex. 6, 7 to Doc. No. 70.]

Even when viewed in the light most favorable to Plaintiff, this evidence does not

_____

[1]Contrary to Plaintiff's contention, vision and dental benefits are not part of the mandatory medical coverage required under the "Custom Benefits Plan."  Rather, the "Custom Benefits Plan" documents submitted by the parties, as well as Plaintiff's pay stubs, list vision and dental coverage as separate categories of optional benefits that are distinguished from the plan's mandatory medical coverage (or "Employee Health Plan").  [Ex. 1, 4 to Doc. No. 70.]

support a reasonable inference that the 40% long-term disability coverage was optional or that Defendant PHS did not contribute to the payment of this long-term disability coverage by means of the "Custom Dollars" the company gave Plaintiff.  In similar circumstances, the Tenth Circuit has not allowed a plaintiff to avoid the requirements of ERISA by attempting "to sever her optional disability coverage from the rest of the benefits she received through her employer's plan.  'This cannot be done because the [optional] coverage was a feature of the Plan, notwithstanding the fact that the cost of such coverage had to be contributed by the employee.'"  Gaylor, 112 F.3d at 463 (quoting Smith v. Jefferson Pilot Life Ins. Co., 14 F.3d 562, 567 (11th Cir. 1994), and citing Glass v. United of Omaha Life Ins. Co., 33 F.3d 1341, 1345 (11th Cir.1994)).

Similarly, the fact that Defendant UNUM treated Plaintiff's disability insurance premiums as 100% payable in after-tax dollars by the employee is not dispositive for purposes of ERISA.  See Crull v. Gem Ins. Co., 58 F.3d 1386, 1390 (9th Cir. 1995) ("[T]here is little economic difference (excepting tax consequences) between in-kind payments of health insurance and deductions from an employee's payroll.").  As noted above, the funding of Plaintiff's disability insurance policy was structured as an after-tax payment by the employee so that any disability benefits she received under the policy could be treated as non-taxable income.  See Proposed Treasury Regulation § 1.125-2, 54 Fed. Reg. at 9501.  This funding structure does not change the mandatory nature of the 40% disability coverage, nor does it change the fact that Defendant PHS made contributions in the form of "Custom Dollars."

Because the undisputed facts and evidence of record show that Defendant PHS contributed funds to pay for at least a portion of the policy's premiums and that participation in the 40% disability portion of the policy was mandatory, the plan in question does not meet the requirements of the "safe-harbor" provision in the Department of Labor regulations.  See Gaylor, 112 F.3d at 463; Crull, 58 F.3d at 1390.  I next turn to the question whether the long-term disability plan at issue here falls under the other conventional elements of an ERISA plan.

Plaintiff does not dispute that she was an employee of Defendant PHS, and based on the above discussion there can be no dispute that the plan at issue here provided a disability "benefit" through "the purchase of insurance or otherwise."   29 U.S.C. § 1002(1). Nevertheless, Defendant PHS must establish or maintain a plan, fund, or program for this purpose in order to meet the other elements of ERISA's definition of an "employee welfare benefit plan."  See Gaylor, 112 F.3d at 464.  "A 'plan, fund, or program' exists if 'from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and the procedures for receiving benefits.' Peckham, 964 F.2d at 1047 (quoting Donovan, 688 F.2d at 1373).

The undisputed facts and evidence of record in this case show that Defendant PHS's plan meets this element of the statutory definition.  The plan documents submitted with the parties' motion papers identify the various categories and levels of benefits the plan is intended to cover; the class of employees, spouses, and dependents whom the plan is intended to benefit; the respective sources of employee and employer financing for the plan's

benefits; and the procedures for receiving benefits.  [Ex.1, 2, 3, 5 to Doc. No. 70; Ex. B, C, D, F to Doc. No. 65.]

In order to fall under ERISA's definition of an "employee welfare benefit plan," the plan also must be "established or maintained" by Plaintiff's employer, Defendant PHS.  See Gaylor, 112 F.3d at 464.  In other words, the plan must be "part of an employment relationship," and generally there must be "an expressed intention by the employer to provide benefits on a regular and long-term basis."  Id.; accord Anderson v. UNUM Provident Corp., 369 F.3d 1257, 1263-68 (11th Cir. 2004).

The plan at issue here meets these requirements.  As in Gaylor and Anderson, Defendant PHS's disability plan was "part of a comprehensive insurance program providing to ... employees several different kinds of insurance," and Defendant PHS "distributed to its employees a handbook detailing ERISA rights [Ex. C to Doc. No. 65], which is 'strong evidence that the employer has adopted an ERISA regulated plan.'"  Gaylor, 112 F.3d at 464-65 (quoting Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1083 (1st Cir. 1990)); accord Anderson, 369 F.3d at 1266.  "The fact that an employer delegates part of the operational responsibility for the plan to the insurer does not mean that it did not 'establish or maintain' a plan."  Gaylor, 112 F.3d at 464 (citing  29 U.S.C. § 1105(c)(1)).

Notwithstanding these authorities, Plaintiff contends that Defendant PHS's disability plan is not governed by ERISA because it is closely associated with the company's "cafeteria plan" under Section 125 of the Internal Revenue Code.  26 U.S.C. § 125(d)(1).  According to Plaintiff, a cafeteria plan under Section 125 is incompatible with an ERISA welfare benefit

14

plan because a cafeteria plan does not comply with ERISA's "exclusive benefit rule" and "funding policy." [Doc. No. 70, at 3.]

The "exclusive benefit rule," to which Plaintiff alludes in her response to Defendant PHS's motion, states in relevant part that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1).  Another provision of ERISA, cited by Plaintiff as the "funding policy," provides that:  "Every employee benefit plan shall . . . provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of this subchapter ...." 29 U.S.C. § 1102(b).

Neither ERISA's funding policy nor its exclusive benefit rule form part of the statutory definition of an "employee welfare benefit plan." 29 U.S.C. § 1002(1).  Rather, the funding policy and exclusive benefit rule only apply once it is determined that a plan falls under this statutory definition.  See Mem'l. Hosp. Sys. v. Northbrook Life Ins. Co., 904 F.2d 236, 241 n.5 (5th Cir. 1990).  Thus, the fact that a plan is being implemented in a way that violates the funding policy or exclusive benefit rule does not necessarily mean that the plan no longer qualifies as an "employee welfare benefit plan."  If that were the case, then fiduciaries who violate these requirements could avoid liability simply by claiming that, by virtue of such violations, their plans were no longer subject to ERISA.  See id. at 241.  Surely Congress did not intend such an absurd result when it enacted ERISA and the Internal

Revenue Code.  See Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); cf. Varity Corp. v. Howe, 516 U.S. 489, 513 (1996) ("[I]t is hard to imagine why Congress would want to immunize breaches of fiduciary obligation that harm individuals by denying injured beneficiaries a remedy").

A careful reading of the statutes and their implementing regulations reveals that employee welfare benefit plans under ERISA and cafeteria plans under Section 125 of the Internal Revenue Code are not mutually exclusive and may be closely associated with one another.  There is, however, a regulatory distinction between the two plans that is articulated in an opinion letter issued by the Department of Labor's Office of Pension and Welfare Benefit Programs.  See Opinion No. 96-12A, Pens. Plan Guide (CCH) ¶ 19,984P, 1996 WL 423472 (1996).  The function of a cafeteria plan under Section 125 "is to provide a method by which employees may receive tax-favored treatment of contributions" that may be required under an employee welfare benefit plan (such as health or disability insurance governed by ERISA).  Id.  "The provision of this tax-favored treatment, however, is not the equivalent of the provision of a benefit" enumerated under ERISA's statutory definition of an employee welfare benefit plan.  Id.  Thus, the cafeteria plan under Section 125 "does not constitute, in itself, a separate employee welfare benefit plan within the meaning of" ERISA's statutory definition of this term.  Id.  Rather, a cafeteria plan simply forms the mechanism by which employee contributions are used to fund the ERISA employee welfare

16

benefit plan(s) with which that cafeteria plan is associated.  See id.

The Department of Labor has further determined that employers who structure their employee's contributions to an employee welfare benefit plan under the auspices of Section 125 are still "subject to the fiduciary standards of ERISA."  Id.  In particular, such employers are still expected to abide by ERISA's requirement that "such contributions constitute 'plan assets' of the [employee welfare benefit plan] 'as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets.'"  Id. (quoting 29 C.F.R. § 2510.3-102).  But cf. Extension of Enforcement Policy with Respect to Welfare Plans with Participant Contributions, 58 Fed. Reg. 45,359 (Aug. 27, 1993) (noting that the Department of Labor has adopted a non-enforcement policy with respect to "the trust and certain annual reporting requirements, including the audit requirements, of ... ERISA for so-called 'cafeteria' plans (described in section 125 of the Internal Revenue Code)").  These administrative determinations lend further support to the conclusion that Defendant PHS's use of a cafeteria plan under Section 125 as a funding mechanism for its disability plan does not take that disability plan outside the scope of ERISA's statutory definition of an "employee welfare benefit plan."

Finally, there is no merit to Plaintiff's contention that Defendant PHS's fiduciary duties under ERISA are incompatible with the tax advantages Defendant PHS may receive by virtue of its cafeteria plan under Section 125.  As noted above, many of the tax advantages of Defendant PHS's cafeteria plan inure to the benefit of its employees, including Plaintiff. See Opinion No. 96-12A, supra (noting that the function of a cafeteria plan under Section

125 "is to provide a method by which employees may receive tax-favored treatment of contributions"); Proposed Treasury Regulation § 1.125-2, 54 Fed. Reg. at 9501 (advising that benefits received by a disabled employee pursuant to a long-term disability policy are non-taxable when, as here, the premiums on that policy are paid on an after-tax basis).

It is also true that cafeteria plans may advantage employers and disadvantage employees in some respects. Insofar as Section 125 allows employees to convert otherwise taxable compensation into non-taxable benefits, for example, the resulting decrease in taxable compensation may reduce employers' liability for FICA/FUTA taxes while simultaneously reducing the employees' net FICA/FUTA income used in calculating their social security benefits. See Roberta Casper Watson & Jo Anne Rosenfeld, Flexible Benefits: Cafeteria Plans and Other Fringe Benefits, ALI-ABA Video Law Review 81, 86 (Apr. 9, 2003). In addition, employees who elect to participate in flexible spending arrangements under Section 125 are subject to a "use it or lose it" rule, under which employee contributions that are not used by the end of the year of coverage are forfeited, and the forfeited amounts may be used to reduce required premiums for the following year or may be returned to the premium payers as dividends or premium refunds on a reasonable and uniform basis. See Proposed Treasury Regulation § 1.125-2, 54 Fed. Reg. at 9504.

Nevertheless, these respective tax advantages and disadvantages of a cafeteria plan, in and of themselves, are "not the equivalent of a benefit" enumerated under ERISA's statutory definition of an employee welfare benefit plan. See Opinion Letter No. 96-12A, supra. Therefore, it is not appropriate to treat a cafeteria plan offering such tax consequences

as if it were a separate type of "benefit" subject to the fiduciary standards imposed by ERISA.  See id.

Even if such standards were to apply indirectly to the tax consequences of funding an ERISA benefit plan through a cafeteria plan, the undisputed facts and evidence of record in this case do not support a reasonable inference that these tax consequences disadvantaged Plaintiff to such a degree as to cause a breach of fiduciary duty under ERISA.  There is no evidence that Defendant PHS "participate[d] knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense." Varity Corp., 516 U.S. at 506.  Moreover, the remedy for such a breach of fiduciary duty is not to declare that ERISA is inapplicable, but rather to provide "appropriate equitable relief" under ERISA.  See id. at 515.

For all of the above reasons, I conclude that there are no disputed issues of material fact which would preclude granting summary judgment in favor of Defendant PHS.  Based on the undisputed facts and evidence of record, I further conclude as a matter of law that Defendant PHS's disability plan (including the long-term disability policy at issue here) is an "employee welfare benefit plan" governed by ERISA, and that Plaintiff's ERISA claims under this policy are properly directed at Defendant UNUM, not Defendant PHS.  Defendant PHS's motion for summary judgment is therefore granted.

### B.       Plaintiff's Motion to Amend the Second Initial Pretrial Report

In light of my ruling on Defendant PHS's motion for summary judgment, I conclude that Plaintiff's motion to amend the *Second Initial Pretrial Report* [Doc. No. 66] must be

denied.  The gist of Plaintiff's motion is to allow her to submit additional interrogatories to Defendants and to file additional motions after she receives Defendants' answers to those additional interrogatories.  [Doc. No. 68.]  Neither additional discovery nor an extension for filing motions arising from such additional discovery are warranted at this juncture for the following reasons.

Motions to modify or extend the case-management deadlines set forth in the *Second Initial Pretrial Report* are governed by the "good cause" standard articulated in Fed. R. Civ. P. 16(b) and D.N.M. LR-Civ. P. 16.1.  See generally Rowen v. State of N.M., 210 F.R.D. 250, 252 (D.N.M. 2002) (collecting cases).  "'The primary measure of Rule 16's "good cause" standard is the moving party's diligence in attempting to meet the case management order's requirements.'"  Id. (quoting Bradford v. Dana Corp., 249 F.3d 807, 809 (8th Cir. 2001)).

Plaintiff claims she cannot be faulted for a lack of diligence in complying with the *Second Initial Pretrial Report* [Doc. No. 66] because the discovery deadline stated therein had already expired two days before it was filed, and because her counsel was on vacation during that time.  Such a claim might have merit if Plaintiff had no opportunity to conduct discovery before the *Second Initial Pretrial Report* was entered.   In that situation, a discovery deadline that expires before the *Initial Pretrial Report* is entered would effectively preclude all discovery.

But that is not the case here.  The record reflects that the parties filed a *Provisional Discovery Plan* [Doc. No. 6] on March 24, 2004, in which Plaintiff proposed a discovery

deadline of June 29, 2004, and Defendant UNUM took exception to any discovery.  Plaintiff then filed a *Motion to Compel Production of Documents Pertaining to Plaintiff's Claim for Benefits Under ERISA and Deadline Extension* [Doc. No. 9] on April 6, 2004, which United States Magistrate Judge W. Daniel Schneider denied as moot on May 4, 2004, based on a finding that "the policy, administrative file, and summary plan have been produced."  [Doc. No. 15.]  In response to Plaintiff's motion to reconsider that ruling [17], Judge Schneider later ordered that portions of the claims manual also be produced [Doc. No. 29.]

Meanwhile, Defendant UNUM filed a *Motion for Protective Order* [Doc. No. 16] requesting that no further discovery be permitted on Plaintiff's ERISA claim.   Judge Schneider granted that motion on July 15, 2004.   [Doc. No. 30.]   As stated in Judge Schneider's protective *Order* and the *Order Granting Second Motion to Amend Complaint* [Doc. No. 31] filed on November 17, 2004, judicial review of Plaintiff's ERISA claim for denial of benefits is conducted on the basis of the Administrative Record, and there is no reason to allow additional discovery (beyond production of the Administrative Record) unless Plaintiff can show exceptional circumstances, which she has not done thus far.  See Hall v. UNUM Life Ins. Co. of Am., 300 F.3d 1197, 1202 (10th Cir. 2002).  Accordingly, Plaintiff's ERISA claims do not require an *Initial Pretrial Report*, a trial date, or pretrial deadlines associated with a trial.  [Doc. No. 31, at 3.]

On December 1, 2004, Plaintiff filed a *First Amended Complaint* [Doc. No. 33] containing two other claims that might have triggered such requirements:  (1) a claim against Defendant UNUM under the Fair Credit Reporting Act (FCRA), and (2) a claim against both

Defendants for a declaratory judgment that the policy at issue is not governed by ERISA. Consequently, Judge Schneider held a second scheduling conference under Fed. R. Civ. P. 16 to address these new claims.  [Doc. No.  46.]   Although the record does not reflect a second provisional discovery plan or scheduling order resulting from that conference, Plaintiff proceeded to serve Defendants with a set of interrogatories and requests for production on February 14, 2005 [Doc. No. 51, 52], followed by another set of discovery requests on May 13, 2005 [Doc. No. 60, 61].

On May 20, 2005, Plaintiff's FCRA claim was dismissed in the *Memorandum Opinion and Order* [Doc. No. 62] granting partial summary judgment in favor of Defendant UNUM.  This ruling applies to Defendants "John & Jane Does 1-3" as well because Plaintiffs' *First Amended Complaint* only lists these Defendants as agents or employees of Defendant UNUM with respect to her FCRA claim, and Plaintiff has not sought leave in a timely manner to pursue any separate claims against the "John & Jane Doe" Defendants. Thus, the "John & Jane Doe" Defendants also will be dismissed from this case at this time.

Because Plaintiff's FCRA claim had been dismissed and the scope of discovery on her ERISA claim was already defined in prior rulings, the *Second Initial Pretrial Report* [Doc. No. 66] filed on May 26, 2005, only provided for discovery on "Plaintiff's claim for declaratory judgment on whether Group Long-Term Disability Policy No. 344090 is a welfare disability plan for the purposes of ERISA." [Doc. No. 66, at 6.] The *Second Initial Pretrial Report* also notes that Defendant UNUM takes exception to such discovery based on its assertion that the plan in question is governed by ERISA.  [Doc. No. 66, at 11.]

22

After the *Second Initial Pretrial Report* was entered, Defendant PHS moved for summary judgment on all of Plaintiff's claims, including the claim for declaratory judgment on whether the long-term disability policy is governed by ERISA.   Plaintiff's response to this motion focused exclusively on this claim for declaratory judgment and did not identify any legal or factual basis for denying summary judgment as to any other claims against Defendant PHS.

The Court now grants Defendant PHS's motion for summary judgment as to all of Plaintiff's claims and determines as a matter of law that the disability plan at issue here is an employee welfare benefit plan governed by ERISA.  Plaintiff has not shown by way of an affidavit under Fed. R. Civ. P. 56(f), or otherwise, that the expanded discovery she requests is likely to produce disputed issues of material fact that would affect these rulings. See Ernie Haire Ford, Inc., 260 F.3d at1290 n.2.

Accordingly, there is no longer any basis for conducting further discovery as to Defendant PHS or as to Plaintiff's claim for declaratory judgment.  The only remaining claims are Plaintiff's ERISA claims against Defendant UNUM.

Defendant had the opportunity to seek discovery on her original ERISA claim in 2004, when she filed her motion to compel [Doc. No. 9] and Defendant UNUM filed its motion for a protective order [Doc. No. 16].  She did not file a timely motion challenging Judge Schneider's rulings on the issues raised therein [Doc. No. 15, 29, 30].

For these reasons, I conclude that Plaintiff has not shown the requisite level of diligence to establish good cause for expanding discovery or extending deadlines with

respect to her remaining ERISA claims against Defendant UNUM.  I further conclude that Plaintiff's motion to expand discovery and extend pretrial deadlines must be denied as moot insofar as it pertains to the declaratory judgment and FCRA claims which have been dismissed from this action, as well as any other claims against Defendant PHS, which also has been dismissed from this action in this *Memorandum Opinion and Order*.

By separate order, this Court will set a briefing schedule on Plaintiff's remaining ERISA claims against Defendant UNUM.  This schedule will include a deadline for filing any motions to supplement the Administrative Record produced by Defendant UNUM regarding these claims.

III.   **CONCLUSION**

For the foregoing reasons, Defendant PHS is entitled to summary judgment on all of Plaintiff's claims, and Plaintiff's motion to amend the *Second Initial Pretrial Report* is denied.

**IT IS, THEREFORE, ORDERED** that the *Motion for Summary Judgment of Defendant Presbyterian Healthcare Services* [Doc. No. 63] is **GRANTED**.

**IT IS FURTHER ORDERED** that all of Plaintiff's claims against Defendant PHS are **DISMISSED WITH PREJUDICE**, and Defendant PHS is **DISMISSED** from this action.

**IT IS FURTHER ORDERED** that Defendants John & Jane Does 1-3 are **DISMISSED** from this action.

**IT IS FURTHER ORDERED** that Plaintiff *Padilla's Motion to Amend Initial Pretrial Report Entered on May 26, 2005 & Motion to Allow Plaintiff to Submit More than 25 Interrogatories to Defendants* [Doc. No. 68] is **DENIED**.

**SO ORDERED** this 29th day of August, 2005, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge