# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**MARY PADILLA**,

      Plaintiff,

    vs.                        No.     **CIV 03-1444 MCA/WDS**

**UNUM PROVIDENT**, a/k/a
**UNUM LIFE INSURANCE COMPANY
OF AMERICA**,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff Mary Padilla's *Motion for Summary Judgment to Recover Benefits Due to Her Under the Terms of Her Plan and Memorandum in Support* [Doc. 82] filed on October 12, 2005, pursuant to the briefing schedule set forth in the Court's *Order* [Doc. 78] of August 29, 2005. Having considered the parties' submissions, the administrative record, the applicable law, and otherwise being fully advised in the premises, the Court determines that Plaintiff is entitled to recover further disability benefits under the long-term disability policy issued by Defendant UNUM Provident (UNUM), but those benefits must be reduced and offset to account for the Social Security benefits Plaintiff is already receiving. Accordingly, Plaintiff's motion is granted in part and denied in part.

## I.    BACKGROUND

The history of this litigation is recounted in the Court's prior rulings. [Doc. 31, 62,

77, 78, 95.]  Presently before the Court is Plaintiff's claim that she is entitled to further disability benefits under the terms of a long-term disability insurance policy governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 to 1461.  Conjoined with this claim is the defense or counterclaim that any such ERISA benefits must be reduced or offset to account for the Social Security benefits that Plaintiff is already receiving.

Before filing her claim for disability benefits, Plaintiff worked for Presbyterian Healthcare Services (PHS) as a Licensed Practical Nurse (LPN) in Albuquerque, New Mexico, from 1981 until February 2000.  [U/A 399, 438]  Through her employment with PHS, Plaintiff obtained coverage under a long-term disability insurance policy issued by Defendant UNUM (hereinafter "the PHS policy").

The PHS policy defines the terms "disability" and "disabled" to mean that because of injury or sickness:

1.      the insured cannot perform each of the material duties of his regular occupation; and

2.      after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted, taking into consideration training, education or experience, as well as prior earnings . . . .

[U/A 157.]  The PHS policy further provides, in relevant part, that:  "When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period," which lasts 90 consecutive days from the first day of disability. [U/A 149, 153, 161.]

2

Assuming that the insured meets the policy's definition of being "disabled" after benefits have been paid for 24 months, such benefits may continue for a "maximum benefit period" up to "age 65 but not less than 60 months." [U/A 148.] However, the amount of the monthly benefit provided under the PHS policy may be reduced to account for "other income benefits," which the policy defines as including the amount of disability benefits under the Social Security Act for which the insured is eligible and which are "payable as a result of the same disability for which this policy pays a benefit." [U/A 162-63.]

In this case, there is no dispute that Plaintiff met the definition of being "disabled" for the first 24 months and 11 days during which Defendant UNUM paid her disability benefits under the PHS policy (*i.e.*, May 26, 2000, to June 6, 2002). There is also no dispute that the elimination period for Plaintiff's disability ended on May 25, 2000, which is 90 days after Plaintiff stopped working in February 2000. [U/A 149, 153, 438.]

On the latter date, Plaintiff was 54 years old. She has a history of lower back problems dating back to a 1984 injury. By February 2000, Plaintiff's back problems had worsened to the point that she required surgery and could no longer safely perform the lifting that was required in her duties as an LPN providing bedside care to patients. In March 8, 2000, Plaintiff underwent lumbar spine surgery to fuse together some of her vertebrae. [U/A 20, 1039.]

Following her surgery, Plaintiff began filling out the paperwork for her long term disability claim under the PHS policy. [U/A 146-77, 438-39.] This paperwork included a statement from her physician opining that she would be "temporarily totally disabled for 9-12

3

months."  [U/A 446-47.]

    In a letter dated May 23, 2000, Defendant UNUM informed Plaintiff that her request for disability benefits under the PHS policy was approved for a 24-month period effective May 26, 2000.  The letter also instructed Plaintiff on how to apply for Social Security Disability Insurance (SSDI) benefits from the Social Security Administration (SSA).  [U/A 404-08.]

    As noted in a prior ruling of this Court [Doc. 62, at 3], the paperwork supplied to Plaintiff at the time Defendant UNUM initially paid her benefits in June 2000 included a "Disability Payment Options" form.  Plaintiff checked a box on this form and signed it, indicating that she wished to receive monthly payments from Defendant UNUM with no reduction for estimated SSDI benefits until the SSA made a decision on her eligibility.  By signing this form, Plaintiff also agreed to "supply UNUM with a copy of the Social Security decision and repay any overpayment in full within 30 days from receipt of the Social Security award check."  [Ex. 5 to Doc. 58.]

    Plaintiff applied for SSDI benefits and, although the SSA initially denied her application on August 3, 2000 [U/A 392], she subsequently received a favorable determination in a letter from the SSA dated October 23, 2002.  [U/A 995.]  By that date, however, the initial 24-month period for which Defendant UNUM approved her disability benefits had expired, and Defendant UNUM decided not to pay Plaintiff any further disability benefits under the PHS policy.  Based on the favorable decision from the SSA, Defendant UNUM also demanded that Plaintiff reimburse the company for some of the

4

disability benefits she had already received under the PHS policy.

Defendant UNUM's decision to stop paying disability benefits to Plaintiff after 24 months is based on its contention that she was able to perform each of the material duties of any gainful occupation for which she is reasonably fitted, taking into consideration her training, education or experience, as well as prior earnings.  Defendant UNUM contends that the disability benefits Plaintiff receives from the SSA constitute other income payable as a result of the same disability, which must therefore be deducted from the monthly benefits she previously received under the PHS policy.

Defendant UNUM's decision to deny Plaintiff any further disability benefits is documented in a letter dated June 6, 2002.  To support its conclusion that Plaintiff did not meet the PHS policy's definition of being disabled with respect to any gainful occupation, Defendant UNUM's June 6 letter cited the evaluation of its vocational consultant, Genex, which opined that Plaintiff could be gainfully employed as a "Doctor's Office Medical Voucher Clerk" or a "Customer Order Clerk."  [U/A 83.]

Plaintiff retained counsel and pursued an administrative appeal of Defendant UNUM's letter of June 6, 2002, denying further disability benefits under the PHS policy. [U/A 85, 88, 89.]   In conjunction with her administrative appeal, Plaintiff's counsel submitted additional medical evidence to Defendant UNUM, as well as a copy of the SSA decision awarding her SSDI benefits.  [U/A 89-98, 110-18, 253-306.]  The medical evidence submitted with Plaintiff's administrative appeal indicated that her restrictions and limitations were greater than what was acknowledged in Defendant UNUM's letter of June 6, 2002, or

the Genex analysis cited therein.  This additional medical evidence also pointed to symptoms other than those stemming directly from her back problems, *e.g.*, weakness in the hands due to osteoarthritis, fatigue requiring intervals of rest during the day, and depression.

Defendant UNUM initially responded to Plaintiff's additional evidence in a letter dated December 9, 2002.  The December 9 letter acknowledged some of the additional restrictions and limitations imposed by Plaintiff's treating physician but questioned their permanence, citing the absence of "objective documentation" concerning a diagnosis of spondylolisthesis.  [U/A 321.]

After further review of Plaintiff's medical records, Defendant UNUM issued its final letter terminating Plaintiff's disability benefits under the PHS policy on August 20, 2003.  The August 20 letter acknowledged receiving objective documentation of spondylolisthesis, a permanent injury, but discounted the psychiatric symptoms cited in the SSA decision awarding SSDI benefits to Plaintiff on the grounds that these symptoms  were not the source of any functional impairment and did not add to the restrictions and limitations on her ability to work.  [U/A 232.]

After Defendant UNUM denied Plaintiff's administrative appeal, this litigation followed.  During the course of the litigation, Plaintiff initially pursued issues other than the merits of her ERISA claim.  Thus, the litigation of that claim was delayed while the Court resolved disputes over whether Plaintiff's claims were governed by ERISA in the first place, whether she could assert a Fair Credit Reporting Act (FCRA) claim against Defendant UNUM, and whether Plaintiff could assert additional claims against Defendant PHS.  [Doc.

31, 62, 77.]  When the focus of the litigation eventually returned to Plaintiff's ERISA claim, Defendant UNUM produced the administrative record concerning its decisions on Plaintiff's application for disability benefits under the PHS policy, thereby enabling the Court to conduct its review of these decisions.  [Doc. 78, 79, 96.]  The Court also ruled on the extent to which Plaintiff was permitted to supplement the administrative record.  [Doc. 95.]

## II.    ANALYSIS

### A.    Standard of Review

The Court has previously ruled that Plaintiff's remaining ERISA claim for denial of further disability benefits under the PHS policy is subject to *de novo* review [Doc. 95], and both parties have agreed to this standard.  [Doc. 80, 90.]  The Court applies the *de novo* standard because the parties have not identified any plan document which gives the plan administrator or fiduciary the type of discretionary authority that would trigger a more deferential standard of review.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  In particular, the plan requires "proof that an insured is disabled" without conferring discretion on a plan administrator to decide what proof is satisfactory.  The Tenth Circuit has previously held that such language in a plan triggers *de novo* review.  See Ray v. UNUM Life Ins. Co. of Am., 314 F.3d 482, 485-86 (10th Cir. 2002).

Notwithstanding the parties' agreement as to the standard of review, Plaintiff has entitled her opening brief a "motion for summary judgment" and alluded to the possibility that she may file other such motions in a piecemeal fashion during this litigation.  These actions do not accord with ERISA's standard for *de novo* review of the Administrative

Record, nor do they accord with the procedure set forth in the *Order Setting Briefing Schedule* [Doc. 78], which was specifically crafted to facilitate this form of review.

The *Order Setting Briefing Schedule* sets specific deadlines for the filing of each brief and states that the parties' briefs are to be substantially in the form specified in Rule 28 of the Federal Rules of Appellate Procedure.  The Federal Rules of Appellate Procedure do not contemplate that parties will file their briefs in the form of a motion for summary judgment, nor do they contemplate that parties may unilaterally file multiple rounds of briefing in the same appeal.

Motions for summary judgment are governed by Fed. R. Civ. P. 56.  The standard articulated in that rule conflicts with the *de novo* review of the Administrative Record required in ERISA cases.  In particular, a motion for summary judgment under Fed. R. Civ. P. 56 requires the Court to view the evidence in the light most favorable to the non-moving party and to deny the motion if there is any disputed issue of material fact.  See Fed. R. Civ. P. 56(c); Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).  *De novo* review of the Administrative Record in an ERISA case does not require the Court to view the evidence in the light most favorable to the non-movant or to deny summary judgment if the evidence contains conflicting medical opinions.  See Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517-18  (1st Cir. 2005).  For these reasons, the Court will disregard the title of Plaintiff's *Motion for Summary Judgment* and treat that document as the opening brief that she was required to file in accordance with the Court's *Order Setting Briefing Schedule* [Doc. 78] and the Federal Rules of Appellate Procedure referenced therein.

Under the *de novo* standard of review applied in ERISA cases, "no deference is given to the administrator's interpretation of the plan language. Rather, the court interprets the plan de novo, and applies the normal rules for contract interpretation." Id. at 517.   As for the administrator's application of the plan language to the facts of the case, *de novo* review allows the Court to engage in "independent weighing of the facts and opinions in ... [the administrative] record to determine whether the claimant has met h[er] burden of showing [s]he is disabled within the meaning of the policy.  While the court does not ignore facts in the record, the court grants no deference to administrators' opinions or conclusions based on these facts." Id. at 518 (citation omitted).

### B.    Whether Plaintiff is disabled within the meaning of the PHS policy

I first address Plaintiff's claim that she is entitled to further disability benefits under the PHS policy.  Under the terms of that policy, her entitlement to such benefits depends on whether "because of injury or sickness . . . after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which [s]he is reasonably fitted, taking into consideration training, education or experience, as well as prior earnings . . . ."  [U/A 157.]

Based on my *de novo* review of the administrative record, I determine that Defendant UNUM erred in concluding that, after the initial 24-month period of her disability, Plaintiff's injury or sickness did not render her incapable of performing each of the material duties of any gainful occupation for which she is reasonably fitted, taking into consideration training, education or experience, as well as prior earnings.  Based on the evidence contained in the

administrative record, I further determine that Plaintiff has met her burden of proving that she remained "disabled" within the meaning of the PHS policy after this initial 24-month period.

I begin my analysis by noting the inconsistencies and omissions in the denial letters issued by Defendant UNUM on June 6, 2002; December 9, 2002; and August 20, 2003. The June 6 letter expressly relies on the "Transferable Skills Analysis" completed on April 16, 2002, by Defendant UNUM's vocational consultant, Genex. [U/A 64-68, 82-84.] Both Defendant UNUM's June 6 letter and the Genex analysis are premised on an incorrect and incomplete citation of the medical records concerning the restrictions and limitations, or "R&L's," that result from Plaintiff's back problems.

Both the June 6 letter and the Genex analysis list Plaintiff's R&L's as "occasional lifting up to 20 lbs., no bending, kneeling, crawling, pushing or pulling, and occasional climbing and reaching above the shoulder." [U/A 66, 83.] For the source of these R&L's, the Genex analysis cites a "Medical Review by Clinical Consultant Norma Wayne, RN, BSN, dated 3/25/02." [U/A 66.] Ms. Wayne's medical review in turn cites an Estimated Functional Abilities Form (EFAF) attributed to Dr. Gelinas and dated 6/20/01. [U/A 59.]

But Ms. Wayne's medical review dated 3/25/02 does not rely exclusively on the R&L's derived from Dr. Gelinas' EFAF dated 6/20/01. Instead, Ms. Wayne's medical review also cites a more recent set of R&L's attributed to Dr. Gelinas and dated 12/24/01. This more recent set of R&L's include "[s]edentary activities. No lifting > 5 lbs., no walking > ½ mile per day (?), no sitting or standing > 30 minutes at time." [U/A 59, citing U/A 20.]

Ms. Wayne's medical review concludes that the "R&L's dated 12/24/01 appear to be reasonable and permanent." [U/A 59.] Nevertheless, the transferable skills analysis performed by Genex failed to account for the more restrictive R&L's dated 12/24/01, including the restrictions on sitting or standing for more than 30 minutes at a time.

Defendant UNUM acknowledged this omission in its letter of December 9, 2002, providing the company's initial response to Plaintiff's administrative appeal. The December 9 letter cited a review of medical records undertaken by a board-certified orthopedic surgeon, who noted a record dated December 24, 2001, stating "that lifting should not exceed five pounds and that [Plaintiff] should not sit for more than 30 minutes at a time." [U/A 320.] This is the same record cited in Ms. Wayne's medical review dated 3/25/02. [U/A 59.]

Nevertheless, Defendant UNUM's December 9 letter denied Plaintiff further disability benefits for a new and different reason, namely the alleged absence of "objective documentation" concerning a diagnosis of spondylolisthesis. [U/A 321.] Defendant UNUM's questions about this diagnosis affected its conclusions regarding the permanence of Plaintiff's back problems and the R&L's associated with those problems.

These questions were answered by the time of Defendant UNUM's letter of August 20, 2003, which acknowledges that there is objective documentation for the diagnosis of Plaintiff's spondylolisthesis of the lumbar spine, and that spondylolisthesis is a permanent condition. The August 20 letter also acknowledges that, in addition to spondylolisthesis, Plaintiff suffers from "osteoarthritis, low back pain, and chronic depression." [U/A 234.]

Despite acknowledging Plaintiff's osteoarthritis and the more restrictive R&L's

11

pertaining to her ability sit or stand for more than 30 minutes at a time, the focus of Defendant UNUM's letter of August 20, 2003, turns to explaining why Plaintiff's psychological symptoms are not an independent source of any functional impairment. This final letter cites no further evidence from its vocational consultant explaining why the osteoarthritis affecting Plaintiff's hands, when combined with the more restrictive R&L's pertaining to her ability to sit or stand for more than 30 minutes, would not affect Plaintiff's suitability for the positions of "Doctor's Office Medical Voucher Clerk" or "Customer Order Clerk" previously identified in the June 6 letter and the Genex analysis of April 16, 2002. Defendant UNUM points to nothing in the Administrative Record showing that the analysis performed by Genex on April 16, 2002, was ever updated to account for correct and complete information regarding these aspects of Plaintiff's medical status.

Without such an update, the reasoning in Defendant UNUM's denial letters is erroneous because it relies on a transferable skills analysis that entirely fails to consider important aspects of Plaintiff's medical status. Cf. Filipowicz v. Am. Stores Benefit Plans Comm. 56 F.3d 807, 813 (7th Cir. 1995) (noting that an ERISA decision-maker's reasoning is arbitrary or capricious when it "entirely failed to consider an important aspect of the problem" or "offered an explanation that runs counter to the evidence"). Defendant UNUM identifies no other gainful occupations for which Plaintiff is allegedly suited other than those previously identified in the Genex analysis of April 16, 2002. And with respect to the occupations identified in that analysis, Defendant UNUM does not provide any explanation of assistive technologies, training, or other measures that might be needed to accommodate

Plaintiff's R&L's or her osteoarthritis.  Indeed, the April 16 Genex analysis provides no explanation at all to show how the skills, abilities, or duties of the occupations listed therein would interface with these aspects of Plaintiff's medical status.

The only specific listing of skills, abilities, and duties in the April 16 Genex analysis relates to Plaintiff's previous occupation as a Licensed Practical Nurse (LPN). Citing the U.S. Department of Labor's <u>Dictionary of Occupational Titles</u> (DOT), the Genex analysis identifies this occupation as being "concerned with caring for, training, or treating sick, injured or handicapped people to improve their physical or emotional condition."  [U/A 67.] Again citing the DOT, the Genex analysis identifies the transferable skills associated with the occupation of LPN as follows:

> *Apply technical knowledge, common sense and special medical skills
>   to care for or treat sick or disabled people
> *Instruct, plan, and oversee the work of others
> *Keep accurate records
> *Inspire trust through tact, composure, and manner
> *Adapt quickly to emergency situations.

[U/A 67.]  There is nothing in the Genex analysis or elsewhere in the administrative record to dispute the fact that Plaintiff cannot return to her duties as an LPN because of the R&L's which affect her ability to lift and stand.

Instead, the Genex analysis identifies four other occupations as "appropriate jobs" for Plaintiff:  Hospital Admitting Clerk, Dr.'s Office Receptionist, Medical Voucher Clerk, and Customer Order Clerk.  According to Genex, the estimated monthly income for these four positions ranges from $1224 to $1892, which is between 48.62% and 75.15% of the monthly

income that Plaintiff previously received as LPN.  In its initial denial letter of June 6, 2002,

however, Defendant UNUM only cited the two highest-paid occupations listed in the Genex

analysis, namely the Medical Voucher Clerk and Customer Order Clerk, as falling under the

PHS policy's definition of "any gainful occupation for which [Plaintiff] is reasonably fitted,

taking into consideration training, education or experience, as well as prior earnings."  [U/A

157.]  The June 6 letter defines "gainful occupation" as "an occupation that is or can be

expected to provide you with an income at least equal to 60% of your indexed monthly

earnings within 12 months of your return to work."  [U/A 83.]

     The other two occupations identified in the Genex analysis, namely Hospital

Admitting Clerk and Dr.'s Office Receptionist, do not meet the PHS policy's definition

because they are not "gainful," and because Plaintiff is not "reasonably fitted" to them when

one takes into consideration her prior earnings.  The reported monthly income of a Hospital

Admitting Clerk or Dr.'s Office Receptionist is approximately half of what Plaintiff

previously received as an LPN.  In comparison, the monthly benefit Plaintiff is to receive if

she is "disabled" within the meaning of the PHS policy is 60% of her basic monthly earnings

as an LPN (minus any offsets for other income such as SSDI benefits).  [U/A 161.]

     Thus, when purchasing coverage under the PHS policy, Plaintiff had a reasonable

expectation that she would be protected against a disability that caused her to lose more than

40% of her basic monthly earnings as an LPN.  This reasonable expectation would be

defeated if Defendant UNUM were allowed to interpret the term "disabled" to exclude

coverage for insureds who could perform the duties of some occupation that produced less

14

than 60% of their prior earnings.  Because principles of contract interpretation would not allow Defendant UNUM to treat an occupation producing less than 60% of Plaintiff's prior earnings as a "gainful" occupation to which she is "reasonably fitted," and in any event Defendant UNUM expressly excluded such occupations in its denial letter of June 6, 2002, there is no need to further consider whether Plaintiff would be qualified to work as a Hospital Admitting Clerk or Doctor's Office Receptionist.

My analysis instead turns to the occupations of Medical Voucher Clerk and Customer Order Clerk.  Neither the June 6 letter nor the Genex analysis provide a list of the skills and abilities required for these two occupations.  The Genex analysis does, however, cite the occupational codes for Medical Voucher Clerk and Customer Order Clerk as listed in the DOT.[1]  Plaintiff cites an Internet website where the DOT codes and descriptions are accessible online, with cross-references to the Labor Department's "O*NET" database (http://www.onetcenter.org) that replaced the DOT in recent years.  [Doc. 82, at 15 n. 22 & 23.]

The DOT describes the duties of a "Customer Order Clerk" as follows:

Processes orders for material or merchandise received by mail, telephone, or personally from customer or company employee, manually or using computer or calculating machine: Edits orders received for price and nomenclature. Informs customer of unit prices, shipping date, anticipated delays, and any additional information needed by customer, using mail or telephone. Writes

---

[1]Because the occupational descriptions contained in the DOT and O*NET are public documents analogous to regulations or policy statements issued by the Department of Labor, and the Genex analysis expressly cites or cross-references these sources, the Court does not consider it necessary to supplement the Administrative Record in order to consider them.

or types order form, or enters data into computer, to determine total cost for customer. Records or files copy of orders received according to expected delivery date. May ascertain credit rating of customer [CREDIT CLERK (clerical) 205.367-022]. May check inventory control and notify stock control departments of orders that would deplete stock. May initiate purchase requisitions. May route orders to departments for filling and follow up on orders to ensure delivery by specified dates and be designated Telephone-Order Dispatcher (clerical). May compute price, discount, sales representative's commission, and shipping charges. May prepare invoices and shipping documents, such as bill of lading [BILLING TYPIST (clerical) 214.382-014]. May recommend type of packing or labeling needed on order. May receive and check customer complaints [CUSTOMER-COMPLAINT CLERK (clerical) 241.367-014]. May confer with production, sales, shipping, warehouse, or common carrier personnel to expedite or trace missing or delayed shipments. May attempt to sell additional merchandise to customer [TELEPHONE SOLICITOR (any industry) 299.357-014]. May compile statistics and prepare various reports for management. May be designated according to method of receiving orders as Mail-Order Clerk (clerical); Telephone-Order Clerk (clerical).

U.S. Dep't of Labor, Dictionary of Occupational Titles 217 (4th ed. 1991), available at

http://www.occupationalinfo.org/24/249362026.html.  The O*NET cross-reference for this

occupation is "Order Clerks, Materials, Merchandise, and Service," Code  55323.

The DOT describes a "Medical Voucher Clerk" as follows:

Examines vouchers forwarded to insurance carrier by doctors who have made medical examinations of insurance applicants, and approves vouchers for payment, based on standard rates. Computes fees for multiple examinations, using adding machine. Notes fee on form and forwards forms and vouchers to appropriate personnel for further approval and payment.

U.S. Dep't of Labor, Dictionary of Occupational Titles, supra, at 187, available at

http://www.occupationalinfo.org/21/214482018.html.  The O*NET cross-reference for this

occupation is "Billing, Cost, and Rate Clerks," Code 55344.

The DOT classifies all of these occupations as "sedentary," which is defined as:

Exerting up to 10 pounds of force occasionally (Occasionally:  activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently:  activity or condition exists from 1/3 toto 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

U.S. Dep't of Labor, <u>Dictionary of Occupational Titles</u>, <u>supra</u>, App. C, at 1013.

According to the O*NET information cited above, all of these occupations involve frequent sitting and performing tasks using repetitive motions of the hands and fingers.  As such, it is reasonable to infer that they require a certain degree of wrist-finger speed and finger dexterity for operating both the alphabetical and numeric portions of a keyboard.  It is also reasonable to infer that these positions require a certain degree of trunk strength, as necessary to support the body while seated before a keyboard or desk for significant periods.

Defendant UNUM's contention that Plaintiff is qualified for the occupations of Medical Voucher Clerk and Customer Order Clerk seems to rest on the notion that she could perform at least some of the duties associated with those occupations.  For example, it is possible that Plaintiff could complete the paperwork or data entry for one order or voucher while seated for a period of less than 30 minutes.  It is also possible that some duties, such as speaking on the telephone, could be performed while alternating between different postures to accommodate Plaintiff's R&L's.

But the PHS policy defines the term "disability" by reference to whether the insured can perform "*each* of the material duties of any gainful occupation for which [s]he is

reasonably fitted." [U/A 157.] Courts interpreting similar language in policy definitions have concluded that an insured meets the definition of being "disabled" if she is "unable to perform only a single material duty of" the occupation in question. Lain v. UNUM Life Ins. Co. of Am., 279 F.3d 337, 345 (5th Cir. 2002); Mclure v. Life Ins. of N. Am., 84 F.3d 1129, 1133-34 (9th Cir. 1996). In other words, the conclusion that Plaintiff is no longer "disabled" within the meaning of the PHS policy must be premised on a finding that she is able to perform *all* of the essential duties of any gainful occupation for which she is reasonable fitted.

The evidence of record in this case does not support such a finding. The duties of a medical voucher clerk or customer order clerk are not limited to completing the paperwork or data entry for one order or voucher while sitting or standing for a period of less than 30 minutes. Such duties also entail a certain degree of productivity in completing multiple rounds of paperwork or data entry throughout the workday. And while these occupations may entail some telephone duties, it would not be reasonable to presume that a medical voucher clerk or a customer order clerk could fulfill her job responsibilities without also completing other tasks that require sitting or standing before a keyboard or desk while using repetitive motions of the hands and fingers for more than 30 minutes at a time.

Because the Genex analysis does not provide a sufficient or reliable basis for determining whether Plaintiff could perform these additional duties at any reasonable level of productivity, I must turn to other evidence in the record, namely the evidence submitted with Plaintiff's counsel's letters of September 9, 2002, and thereafter. [U/A 89-98, 110-18,

253-306.] This evidence indicates that, in addition to the back problems which interfere with her ability to sit or stand for sustained periods, Plaintiff also suffers from readily observable osteoarthritic changes in her hands which adversely affect her dexterity as it relates to the repetitive finger and hand motions required of a Medical Voucher Clerk or a Customer Order Clerk. Further, there is nothing in her employment history or in the testing performed by the vocational consultant which would indicate a proficiency in mathematics or numeric keyboarding required for these occupations. Thus, even if one discounts any subjective reports relating to fatigue, pain, or psychological symptoms, the objective evidence in the record still shows that Plaintiff is not "reasonably fitted" to the occupations of Medical Voucher Clerk or Customer Order Clerk when the complete set of R&L's associated with her back problems is considered together with her osteoarthritis and her limited employment history.

It follows from the above analysis that Plaintiff has met her burden of showing that she is entitled to further disability benefits under the PHS policy after the initial 2-year period during which such benefits were initially paid. Defendant UNUM's explanation as to why it believes Plaintiff is not entitled to such benefits is erroneous because it runs counter to the evidence and fails to consider important aspects of her medical status.

### C.   Whether the SSA paid benefits resulting from the same disability

Before calculating the amount of benefits to which Plaintiff may be entitled because of her disability, I must first consider whether that amount must be reduced and offset to account for SSDI benefits that Plaintiff is receiving as a result of the same disability.

19

Contrary to the assertions in Plaintiff's reply brief, the issue of offsetting and deducting the SSDI benefits is not a separate claim or defense outside the purview of this Court's adjudication of Plaintiff's ERISA claim.   Rather, the provisions for such offsets or deductions are an integral part of the PHS policy that the Court applies in calculating the amount of the monthly benefits that Defendant UNUM must pay to remedy its erroneous conclusion as to whether Plaintiff was "disabled" within the meaning of the policy after benefits were paid to her for 24 months.  See, e.g., Bacquie v. Liberty Mut. Ins. Co., 435 F. Supp. 2d 318 (S.D.N.Y. 2006) (reviewing an ERISA claim involving the offset of SSDI benefits); Campos v. Mutual of Omaha Ins. Co., 23 Fed. Appx. 614 (8th Cir. 2001) (unpublished disposition).

On this point, Plaintiff does not dispute the existence of the language in the PHS policy providing for such an offset or deduction where SSDI benefits are "payable as a result of the same disability for which this policy pays a benefit."  [U/A 163.]  Rather, Plaintiff contends that this language does not apply here because Plaintiff's SSDI benefits were awarded for a different disability than her benefits under the PHS policy.

To support this contention, Plaintiff cites Gruber v. Unum Life Ins. Co. of Am., 195 F. Supp. 2d 711 (D. Md. 2002).  Gruber involved an insured who applied for and received benefits under an ERISA plan for what the insurer classified as a "disability due to mental illness" covering a period beginning on January 3, 1995.  Id. at 714. That classification excluded the consideration of pre-existing injuries or illnesses which fell outside the policy's definition of "mental illness," and it resulted in a 24-month limitations period on the duration

of the benefits awarded to the insured.

During part of that 24-month period, the insured also received benefits from Maryland's Worker's Compensation Commission (WCC) and the SSA.  Those SSA and WCC benefits, however, were not classified as relating only to a "disability due to mental illness," nor were they limited to the same time frame as those of the ERISA plan.  Rather, the SSA and WCC benefits were traced back to a variety of physical injuries stemming from a 1992 incident where the insured was violently attacked while working for a previous employer.  See id. at 714-15.  On these facts, the Gruber court concluded that the insured's SSA and WCC benefits were not payable as a result of the same disability as those paid for her "disability due to mental illness" under the ERISA plan.  See id. at 718-19.

The facts of this case are distinguishable from those at issue in Gruber because there is no evidence that Plaintiff has obtained SSDI or worker's compensation benefits relating to a distinct incident with another employer that preceded the date on which she applied for disability benefits under the PHS policy.  Rather, Plaintiff's concurrent applications for SSDI benefits and disability benefits under the PHS policy both resulted from the same event, namely her inability to continue working for PHS as an LPN in February 2000.

Gruber is also distinguishable because there is no indication that Defendant UNUM ever classified Plaintiff's disability as falling under a policy provision limiting coverage for a specific illness or type of injury, i.e., "disability due to mental illness."  [U/A 166.]  The present case instead involves the more generic policy definitions for "disability," which refer to a period during which the insured cannot perform the duties of an occupation.  Where

such generic definitions are at issue, "[i]t is clear to the Court that 'Disability' refers to the effect, *i.e.*, the inability to sustain employment, rather than the cause, *i.e.*, the specific condition preventing employability." <u>Bacquie</u>, 435 F. Supp. 2d at 328. Thus, "[t]he phrase 'same Disability' is used to limit the potential offset attributed to other sources of income-- here SSDI benefits--to a defined period of disability, regardless of how many or few separate medical conditions render the covered person unable to work." <u>Id.</u>

After determining that Plaintiff was no longer capable of working in her lifelong profession as an LPN, it is true that the SSA and Defendant UNUM may have reached different opinions as to how many or few of Plaintiff's medical conditions they should consider in determining whether she was able to return to work in some other occupation. As a technical matter, the SSA's eligibility criteria for SSDI benefits are not exactly the same as the eligibility criteria for benefits under Defendant UNUM's ERISA plans.  Minor differences between the administrative records submitted to the ERISA plan administrator and the SSA also are to be expected, because the two types of applications are not always submitted or decided under exactly the same administrative procedures.

Such minor technical and procedural differences between the SSA's administration of SSDI benefits and Defendant UNUM's administration of benefits under the PHS policy do not change the fact that payment of both types of benefits resulted from the same precipitating event or condition during the same time frame, namely Plaintiff's inability to continue working for PHS as an LPN in February 2000.  It is Plaintiff's inability to continue working after that date which defines the "same disability" under the PHS policy, not the

diagnosis of a particular medical condition (*e.g.*, back problems) or combination of such conditions (*e.g.*, back problems, osteoarthritis, and depression).  See Bacquie, 435 F. Supp. 2d at 328; Campos, 23 Fed. Appx. at 615.

If the Court were to ignore this basic fact and instead look to the minutiae of technical and procedural differences between the administration of SSDI benefits and ERISA plans, then the use of the term "same disability" in the PHS policy would be superfluous, because no determination of disability under that policy could ever technically qualify as identical to a determination of disability under SSDI.  Applying such a restrictive definition of the term "same disability" runs counter to the "federal common law rules of contract interpretation" that courts routinely apply "to discern the meaning of the terms in an ERISA plan."  Harris v. The Epoch Group, L.C., 357 F.3d 822, 825 (8th Cir. 2004) (citation omitted); accord Bacquie, 435 F. Supp. 2d at 327.   Under federal common law, "'a contract should be interpreted as to give meaning to all of its terms-presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.'"  Harris, 357 F.3d at 825 (quoting Transitional Learning Cmty. at Galveston, Inc. v. United States Office of Personnel Mgmt., 220 F.3d 427, 431 (5th Cir.2000)).

Rather than relying on the highly technical definitions and administrative procedures which distinguish SSDI from ERISA plans, "[a]ny alleged ambiguities in the [ERISA] plan should be reconciled, if possible, by giving the plan's language its ordinary meaning."  Gruber, 195 F. Supp. 2d at 719 (citing Glocker v. W.R. Grace & Co., 974 F.2d 540, 544 (4th Cir.1992)).  Further, "[a] court cannot interpret words in a vacuum, but rather must carefully

consider the parties' context  and the other provisions in the plan." In re New Valley Corp., 89 F.3d 143, 149 (3d Cir. 1996).

Here the PHS policy does not state that both Defendant UNUM and the SSA must rely on exactly the same medical diagnosis in order for SSDI benefits to count as "other income" under the policy.  Rather, the PHS policy only states that "other income benefits" (such as SSDI) "must be payable *as a result of the same disability* for which this policy pays a benefit." (Emphasis added.)  [U/A 163.]  The common denominator between the benefits payable under SSDI and the benefits payable under the PHS policy is Plaintiff's loss of her ability to continue working for PHS as an LPN in February 2000.  That common denominator provides  the ordinary meaning of the term "same disability," from which both the SSDI benefits and the disability benefits under the PHS policy resulted in this case. See Bacquie, 435 F. Supp. 2d at 328; Campos, 23 Fed. Appx. at 615.

Any variance in the consideration of other illnesses or injuries that may have affected Plaintiff's suitability for work in other occupations after February 2000 does not change this conclusion.  Unlike Gruber, such other illnesses or injuries do not provide the basis for a separate, freestanding claim of disability which precedes that date.  For these reasons, I conclude that the SSDI benefits Plaintiff received as a result of the SSA decision of October 23, 2002, are "other income"  which must be deducted from Plaintiff's monthly benefits under the PHS policy.

According to the calculations cited in Defendant UNUM's response brief, Plaintiff's failure to deduct or provide reimbursement for her SSDI benefits resulted in an overpayment

of her disability benefits under the PHS policy in the amount of $17,365.97 ($1,021.20 per month times the number of months and days for which the SSDI and ERISA benefit payments overlapped, minus the amount of attorney fees that Plaintiff incurred in recovering the SSDI benefits).  [Doc. 90, at 16-17, citing U/A 185-95.]  This amount must be deducted from any additional monthly benefits to which Plaintiff is entitled under the PHS policy for the period after June 6, 2002, when Defendant UNUM stopped paying those benefits to her.

Further, the calculation of Plaintiff's monthly benefit under the PHS policy from June 2002 forward must include an offset of $1,021.20 per month to account for the SSDI benefits that Plaintiff has received, or will receive, during that period.  When this amount is subtracted from the $1,510.61 per month in disability benefits under the PHS policy to which Plaintiff would otherwise be entitled, the actual monthly benefit payable to Plaintiff under this policy is $489.41.

To the extent Plaintiff intends to claim pre- or post-judgment interest, attorney fees, or other costs for the unpaid monthly benefits that are due to her under the PHS policy, the Court will only consider such claims insofar as they pertain to the net amount of benefits remaining after both the $17,365.97 overpayment and the $1,021.20 per month offset is deducted.  Further, the Court strongly encourages the parties to meet and confer in order to determine whether they can arrive at a stipulation regarding the net amount Defendant UNUM must pay to Plaintiff in order to comply with the rulings set forth in this *Memorandum Opinion and Order*.

To the extent that the parties are unable to agree on such an amount, they are directed

to advise the Court in writing, and submit simultaneous briefing on this issue, by no later than April 20, 2007.  In the absence of a stipulation by the parties, the Court reserves the right to enter a final judgment addressing the net amount due to Plaintiff under the PHS policy only and leaving the issues of attorney fees and costs for resolution at a later date by means of a post-judgment motion.

## III.   CONCLUSION

For the foregoing reasons, Plaintiff is entitled to recover further disability benefits under the long-term disability policy issued by Defendant UNUM, but those benefits must be reduced and offset to account for the Social Security benefits Plaintiff is already receiving.  The Court will defer entering a final judgment in this matter for a brief period until the conditions set forth in this *Memorandum Opinion and Order* are satisfied.

**IT IS THEREFORE ORDERED** that Plaintiff's *Motion for Summary Judgment to Recover Benefits Due to Her Under the Terms of Her Plan and Memorandum in Support* [Doc. 82] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the parties are directed to meet and confer in order to determine whether they can arrive at a stipulation regarding the net amount Defendant UNUM must pay to Plaintiff in order to comply with the rulings set forth in this *Memorandum Opinion and Order*.

**IT IS FURTHER ORDERED** that, by no later than April 20, 2007, the parties  must advise the Court in writing of any stipulations they have reached as to the net amount due

to Plaintiff and the terms of a proposed final judgment in this case.

**IT IS FURTHER ORDERED** that, to the extent the parties are unable to resolve the remaining issues in this case by stipulation, they shall so advise the Court in writing and submit simultaneous briefing on such issues by no later than April 20, 2007.

**SO ORDERED** this 26th day of March, 2007, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge

27